UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-498 (CJN) |
| ANDREW TAAKE, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Andrew Taake to 78 months of incarceration, 36 months of supervised release, $2,000 in restitution, a $66,339 fine, and the mandatory $100 special assessment. The government's recommended sentence is at the top of Taake's applicable Sentencing Guidelines range, which the government and the PSR submit is 63 to 78 months.

I.      INTRODUCTION

Defendant Andrew Taake, a 35-year-old self-employed handyman from Houston, Texas, violently participated in the January 6, 2021 attack on the United States Capitol—an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred

1

police officers, and resulted in more than 2.9 million dollars in losses.[1]

Taake, while on pretrial release for a pending child-solicitation case in Texas, came to the Capitol ready for violence, armed with bear spray and a metal whip. Without waiting for the former President to finish his speech at the "Stop the Steal" rally, Taake walked to the Capitol and joined the first wave of rioters to breach the restricted perimeter and swarm the West Plaza. Over the next hour, Taake sprayed officers attempting to hold the line with bear-attack repellant spray on at least four occasions, attacked another officer with a metal whip, harassed and prevented the forward progress of police reinforcements, and threw a water bottle at the police line.

Taake then scaled a wall and made his way to the Capitol building, encouraging others to join him. After helping others breach the Parliamentarian Door, he entered the U.S. Capitol through the Senate Wing Door soon after its initial breach. He then wandered around the building for 20 minutes, brandishing his metal whip as he did so.

Soon after the riot, Taake bragged to a stranger about his conduct on January 6 and expressed the possibility of a repeat on Inauguration Day. But upon his arrest, Taake lied to the FBI, denying having been at the Capitol at all. The FBI also recovered three loaded guns from Taake's residence, which he was not allowed to possess due to his status as a felon.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

In over three years since January 6 and nearly three years since his arrest, Taake has continually shifted blame for his criminal actions on January 6 to the victim officers, members of Congress, and the media. His enduring narrative is that he and other "patriots" were heroes and that he is a wrongfully detained victim of "selective persecution." He has not exhibited an ounce of remorse for his actions, nor accepted responsibility—going so far as to deny responsibility even after his guilty plea. And based on reports from his pretrial detention, he has taken to using violence against other inmates to relieve his frustrations with his self-inflicted predicament.

Accordingly, the government's recommended sentence of 78 months' incarceration—the high-end of the advisory Sentencing Guidelines range—reflects the gravity of Taake's premeditated conduct on January 6, 2021.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The Court is well aware of the general background of the January 6, 2021 attack on the Capitol, so the government will refrain from repeating that background here. *See* ECF No. 68.

### B.      Taake's Role in the January 6, 2021 Attack on the Capitol

#### *The Lead-Up to January 6*

The 2020 Presidential election was a watershed moment for Taake. In his mind, the United States government, which had already turned into an "authoritarian, communist hell hole" during the pandemic, had officially been usurped through a fraudulent election. To him, "[i]t seemed as if the Demonicrat deep state and globalist plan to destroy Donald Trump and the USA was going

to succeed." Exhibit 12 at 6.

In the weeks following the election, Taake learned about the "Stop the Steal" rally to be held in Washington, D.C. on January 6. While his friends lost interest in traveling to D.C. to attend the rally, Taake's resolve only hardened, believing he was witnessing a coverup of a stolen election by the Department of Justice, the media, and democrats. In his view, it was long past time for "everyday people" like him to take their "grievances directly to the Swamp creatures responsible for the insanity" that had gripped the country. *Id.* at 7. So on January 5, 2021, Taake traveled from Houston, Texas to Washington, D.C., and brought with him weapons in preparation for violent protest.

### *Breach of the Capitol Building and Taake's Entry into the Capitol*

On the morning of January 6, 2021, Taake—wearing steel-toe boots and carrying a metal whip, bear spray, clear protective glasses, and a walkie-talkie—arrived on the National Mall to attend the "Stop the Steal" rally. While the former President was still speaking on the Ellipse, Taake and others he had met the night prior headed towards the Capitol, where they could observe "heavy police activity." Along the way, Taake climbed on a stone structure to get a better view of the crowd. *See* Image 1.



*Image 1: Taake on top of a structure photographing the crowd*

Taake was among the first rioters to arrive on the west side of the Capitol's restricted perimeter near Peace Circle just before 1:00 p.m. Upon his arrival, he noticed "some commotion about 50 yards to [his] left." Because he "went to the District to be involved in the rally, not stand in the shadows . . . he made [his] way across a section of the lawn to get to the front of the throng of people" breaching the perimeter for the first time. As he crossed the lawn, he passed through downed fencing with "AREA CLOSED" signs affixed to it.

At approximately 12:57 p.m., Taake climbed onto a low wall on the West Plaza of the Capitol and scanned for someone in the crowd. *See* Images 2 and 3. While on the wall, he spoke into a walkie-talkie on his left shoulder (*see* Image 3) and gave a hand to several rioters struggling

to jump the wall.



*Image 2: Screenshot of CCTV at 12:57 p.m. showing Taake on the West Plaza wall*



*Image 3: Taake on top of the West Plaza wall speaking into a walkie-talkie*

Shortly thereafter, Taake hopped down and weaved his way through the crowd to a line of black fencing, which U.S. Capitol Police ("USCP") officers stood behind while attempting to calm the already irate crowd. *See* Image 4.



*Image 4: Taake making his way to the police line on the West Plaza*

The crowd then tore down the black fencing, and the outnumbered USCP officers retreated closer to the building. Taake followed, maintaining proximity to the officers.

At approximately 1:13 p.m., Metropolitan Police Department ("MPD") reinforcements arrived. With the aid of metal bike-rack barricades, the officers slowly pushed rioters away from the Capitol and formed a line behind the barricades. This regrouping enraged the rioters, Taake included. A chaotic physical struggle between officers and rioters broke out.

At approximately 1:16 p.m., Taake surged forward toward the police line. He then sprayed the line with bear spray from approximately ten feet away for about three seconds, engulfing the officers in a cloud of orange chemicals. *See* Images 5–7 and Exhibits 1–2. Following his attack,

Taake quickly fell back into the crowd.

Several MPD officers in the path of Taake's bear spray had retreated from the line the second Taake began to spray. Most escaped the brunt of it. But MPD Officer N.T., outlined in red in Images 6 and 7, was not so fortunate. Though Officer N.T. had attempted to duck out of the way and pull his mask over his mouth mid-attack, the blast nevertheless hit him in the face. Officer N.T. recalls the immediate effects of the spray in vivid detail: excruciating pain, difficulty breathing, and temporary blindness. Given those effects, the only thing he could do was try to stumble away from the danger. But he was not sure whether he was moving towards the safety of his colleagues or into the riotous mob. At that moment, unable to see and entirely vulnerable, Officer N.T. believed he was going to die.



*Image 5: Screenshot of Exhibit 1 at 00:15 of Taake spraying MPD officers with bear spray*



*Image 6: Screenshot of Exhibit 2 at 00:17 of Taake, outlined in yellow, spraying MPD officers, including MPD Officer N.T., outlined in red*



*Image 7: Screenshot of Exhibit 3 at 00:14 of Taake, outlined in yellow, spraying Officer N.T., outlined in red*

Five minutes later, at approximately 1:21 p.m., Taake approached the police line. This time, he sprayed a group of USCP officers from approximately 30 feet away. *See* Image 8. One of the impacted officers then retreated from the line, visibly suffering from the effects of the spray. *See* Exhibit 4 at 00:12.



*Image 8: Screenshot of Exhibit 4 at 00:06 of Taake spraying a line of USCP officers at 1:21 p.m.*

About thirty seconds later, at approximately 1:22 p.m., Taake sprayed a nearby group of USCP and MPD officers from approximately 20 feet away. *See* Image 9. During this third incident, Taake sprayed the officers, took a beat, and then sprayed again, reaching further forward toward the officers during the second spray. *See* Exhibit 4 at 00:36–00:39. Taking notice of Taake, the

police fired back with their own chemical irritant, causing Taake to retreat once more. *See id.* at 00:39.



*Image 9: Screenshot of Exhibit 4 at 00:38 of Taake spraying a line of officers at 1:22 p.m.*

About eight minutes later at 1:30 p.m., Taake, with his metal whip in one hand and bear spray in the other, joined other rioters in a concerted effort to push the police line back. *See* Image 10. Seconds later, Taake reached over the heads of the other rioters and sprayed officers with bear spray for a fourth time. *See* Exhibit 5 at 00:13.



*Image 10: Screenshot of Exhibit 5 at 00:10 of Taake pushing against the police line holding a metal whip and bear spray*

Approximately three minutes later at 1:33 p.m., Taake, standing amidst the mob, picked up

a water bottle and launched it over other rioters at the line of officers. *See* Image 11.



*Image 11: Screenshot of open-source footage of Taake (his arm outlined in yellow) throwing a water bottle (outlined in yellow) at officers*

At approximately 2:00 p.m., a group of MPD reinforcements were trying to make their way through the crowd on the northwest side of the grounds and to the West Plaza. Rioters, Taake among them, surrounded the officers. Then, over the proceeding several minutes, the rioters harassed, shoved, and punched the officers on all sides. As a result of the collective attack, the officers were temporarily prevented from moving in any direction—they were trapped. *See* Image 12. Meanwhile, their fellow officers were struggling to maintain control of the West Plaza and were in desperate need of assistance.



*Image 12: Screenshot of Exhibit 6 at 00:21 of Taake and other rioters preventing the forward progress of the MPD reinforcements*

When the officers broke free of the crowd and began to move forward, Taake followed them, shouted unintelligibly at them, and brandished his metal whip threateningly. *See* Image 13.



*Image 13: Screenshot of Exhibit 7 at 00:08 of Taake brandishing his metal whip at officers*

14

Two minutes later, at approximately 2:02 p.m., several officers were locked in a physical struggle with rioters on the West Plaza. Chaotic body-worn camera ("BWC") footage shows Taake emerging from the crowd and attacking MPD Officer A.A., making contact with Officer A.A.'s forearm with his metal whip. *See* Image 14. Though Officer A.A. did not sustain an injury from this attack, he remembered the incident because of Taake's distinctive weapon.



*Image 14: Screenshot of Exhibit 8 at 00:43 of Taake attacking an officer, whip in hand*

At approximately 2:09 p.m., rioters breached the Northwest Steps of the Capitol building. Taake, with help from another rioter, scaled the outer wall of the stairs (Image 15), climbed on the railing, turned to face the crowd, and threw his hands up victoriously, a metal whip visible in his right (Image 16). He then proceeded to help other rioters scale the wall up to the Steps (Image 17).

15



*Image 15: Screenshot of open-source video of Taake scaling a wall to the Northwest Steps*



*Image 16: Screenshot of open-source video of Taake on Northwest Steps*



*Image 17: Screenshot of open-source video of Taake helping rioters scale a wall*

Several minutes later, Taake climbed the Northwest Steps and crossed the Upper West Terrace to the Northwest Courtyard. One minute after his arrival, at approximately 2:16 p.m., rioters breached the Parliamentarian Door to the Capitol building for the first time. *See* Exhibit 9 at 00:10. Sixteen seconds later, Taake ran up to hold the Parliamentarian Door open for other rioters, waiving them inside. *See id.* at 00:26 and Image 18. When a group of officers arrived to resecure the doors, Taake jumped over the railing and ran away from the scene with a limp. *See id.* at 00:39. While recovering, he waived the crowd on toward the building. *See id.* at 00:53.



*Image 18: Taake, outlined in yellow, holding open the Parliamentarian Door*

At approximately 2:20 p.m., Taake entered the Capitol building through the Senate Wing Door, alarms blaring overhead. *See* Exhibit 10 at 00:04. He then made his way to the Crypt, the Crypt's East Lobby, and various connecting corridors—all the while brandishing his metal whip. *See* Images 19 and 20.



*Image 19: Taake walking whip in hand through the East Crypt Lobby*



*Image 20: Taake walking whip in hand through the Crypt*

While in one House Corridor, Taake encountered a group of rioters confronting a line of police blocking their path. Taake recorded the scene on his phone. *See* Image 21 and Exhibit 11.

19

Eventually, the overwhelmed officers retreated.



*Image 21: Screenshot of Exhibit 11 at 00:25 of Taake, outlined in yellow, standing off with police in a House Corridor*

Taake exited through the Senate Wing Door at 2:40 p.m., having spent approximately 20 minutes inside the Capitol building.

### *Taake's Pre-Arrest Statements*

Though the government is unaware of any public statements made by Taake in the immediate aftermath of the riot, Taake did make private statements on the Bumble dating application[2] before departing the Washington, D.C. area.

---

[2] Bumble is a location-based dating application in which users swipe right to demonstrate interest. For heterosexual matches, females must make the first contact. *See* https://bumble.com/.

In one conversation with a match ("Witness 1"), he both bragged about and downplayed his participation in the riot. *See* Image 22. Specifically, he told Witness 1 that he had been at the riot "from the very beginning" and that officers had sprayed him with chemical irritants, thrown flash-bang grenades at him, and hit him with batons "for peacefully standing there." He also sent her a selfie supposedly snapped thirty minutes after "being sprayed" at the Capitol and boasted that he had been "the very first person to be sprayed" on January 6.



*Image 22: Screenshot of Bumble conversation between Taake (left) and Witness 1 (right)*

Taake went on to explain that he was "fucking fed up" with the federal government when he arrived at the Capitol. But he then diverted blame for the violence at the riot to antifa, the D.C. mayor, and Democratic leaders:

Who do you think incited this violence? That's what they did all summer with BLM

stuff. Only takes a few to get a crowd going. Majority of the people attacking police and smashing windows were all antifa. They just threw on a Trump hat or shirt they bought on the street. They have had this all planned out for weeks. The media is doing what they always do and lying to the people. The mayor and democrat leaders purposefully made sure they did not put up the tall fencing they have up now, and kept the police and security forces limited. ***They wanted this to happen.***

After his return to Texas, Witness 1 asked Taake if he had plans to return to Washington. Taake responded that it would depend on "what happens with the election . . . Biden still isn't in office . . . and there is too much criminal stuff to come out. There are many many Patriots ready and willing to head back depending [*sic*] what happens."

On or about January 9, 2021, Witness 1 submitted screenshots of her messages with Taake, along with other captures of Taake's dating profile, to the FBI. That tip led to Taake's identification.

### *Taake's Arrest and Recovered Weapons*

The FBI arrested Taake at his home in Houston, Texas on July 23, 2021. During his arrest, he told the FBI agents that although he was in Washington, D.C. on January 6, 2021, he was not at the riot. That, of course, was a lie.

During the execution of a search warrant for his home—of which Taake was the sole occupant—the FBI recovered three loaded firearms, along with dozens of ammunition rounds, from his bedside and closet. The firearms included a 9-millimeter pistol, an M4 carbine, and a pump-action shotgun. None of the firearms were registered to Taake—and with good reason: he is a convicted felon and, as such, is prohibited from possessing firearms. *See* 18 U.S.C. § 922(g)(1). The FBI also recovered the whip (Image 23) and the "Counter Assault" bear spray canister (Image 24) that Taake used to assault officers on January 6, 2021.



*Image 23: Photo of the Stinger whip recovered from Taake's home*



*Image 24: Photo of the "Counter Assault" bear spray recovered from Taake's home*

### *The Stinger Whip*

The whip recovered from Taake is a Stinger Whip, advertised as a "multifunctional emergency and personal safety defense tool that helps prevent a violent crime from taking place." As described by the manufacturer, the tool features "an industrial steel cable that allows several

blows to be made in a matter of seconds. Strikes are going to be extremely painful, and they are sure to subdue and discourage any threat." Moreover, the handle of the tool includes a "hardened steel tip" that is "designed to shatter tempered glass if a vehicle is entrapped," as well as a "built-in razor-sharp seatbelt cutter." The manufacturer warns that the use of the Stinger whip risks "serious injury or even death."[3]



*Image 25: Manufacturer image of the Stinger Whip*

---

[3] *See* Stinger whip car emergency tool with seat belt cutter and window breaker, available at https://thestingertools.com/products/stinger-whip-car-emergency-tool-with-seat-belt-cutter-black-elite-edition?variant=32065962672243&currency=USD&utm_medium=product_sync&utm_source=google&utm_content=sag_organic&utm_campaign=sag_organic&utm_source=google-ads&gad_source=1&gclid=CjwKCAiAi6uvBhADEiwAWiyRdi4Nulzr1oXuwfsRj6JtIEIZScNtXrKU3QrJVo4HHpUvPLkN2mt81BoC6oUQAvD_BwE.

### *Counter Assault Bear Attack Deterrent*

Counter Assault developed its brand of bear deterrent with the help of researchers at the University of Montana. It was formulated to protect people from bears—grizzly bears specifically—in a non-lethal manner.[4] On January 6, 2021, Taake carried an 8.1-ounce-sized canister of Counter Assault spray with the accompanying black belt holster.



*Image 26: Manufacturer image of the Counter Assault bear spray with holster[5]*

The front of the canister specifies that active ingredients in the spray include capsaicin and

---

[4] "About Us," Counter Assault, available at https://counterassault.com/pages/about-us.
[5]   32-Foot Bear Spray (8.1 oz.) with Holster, Counter Assault, available at https://counterassault.com/products/8-1-oz-bear-spray-with-holster.

related capsaicinoids ("OC"), which make up 2.0 percent of the product's ingredients.[6]  According to Counter Assault's website,

> Bear spray is formulated to have a longer range (Counter Assault Bear Spray can reach up to 40 feet) than pepper spray (designed to only reach about 10 feet). Most pepper sprays have a lower concentration of capsaicin, the active ingredient in both products, while Counter Assault has the maximum allowed at 2%. Pepper spray designed for self defense will not have the power or distance to deter a bear and ***they are not interchangeable***.[7]

Commercially available pepper spray for use on humans contains concentrations of capsaicinoids ranging from 0.18 to 1.33 percent. *See United States v. Worrell*, 21-cr-292 (RCL), Trial Tr. at 106. A pepper spray with an OC concentration of 1.33 percent corresponds to a Scoville Heat Unit rating ("SHU") of 2 million, which is many times more potent than the hottest peppers humans ever come into contact with or eat. *Id.* at 108–09. As noted, the spray used by Taake contains 2.0 percent OC concentration, which is 50% stronger than a spray containing 1.33 percent OC concentration, since bear spray is designed for use against wild bears and other dangerous animals.

The label of the Counter Assault bear spray aerosol canister reads, "GRIZZLY TOUGH," "NOT FOR USE ON HUMANS," and "TO DETER BEARS FROM ATTACKING HUMANS." It also states, "DANGER: May cause irreversible eye damage if sprayed in the eye at close range. Contact through touching or rubbing eyes may result in substantial but temporary eye injury."

---

[6] All manufacturers of bear spray, including Counter Assault, must register their products and receive approval for labeling and product formulation from the EPA prior to distributing or selling bear spray. *See* Counter Spray Labeling Amendment (Aug. 2, 2018), available at https://www3.epa.gov/pesticides/chem_search/ppls/055541-00002-20180802.pdf.

[7] "What You Need to Know About Bear Spray," Counter Assault, available at ihttps://counterassault.com/blogs/resources/what-you-need-to-know-about-bear-spray.

The label and website also describe the bear spray's effective range and speed. For the canister Taake carried, the deterrent "reaches a 32 foot distance and features a 7 second spray duration."[8]

### Taake's Post-Arrest Statements

Since his arrest in this matter, Taake has given many interviews and statements concerning his actions on January 6, 2021, as well as his subsequent arrest, incarceration pending trial, and prosecution. In the interest of space, the government will summarize and emphasize only the most relevant of Taake's statements here.

In June 2022, Taake sent a lengthy letter to the website "The Gateway Pundit," which then posted the letter in an article on its website. *See* Exhibit 12 at 4–9. In the letter, Taake describes his "typical church going, boy scout family" upbringing, his troubled youth, his substance abuse issues during early adulthood, and his struggles during the pandemic. *Id.* at 4. He then describes at length his feelings about what he believed was a fraudulent election, his experiences in the crowd on January 6 (including the many police dispersal tactics he witnessed), and what he believes was his unjust arrest and detainment.

Throughout the article, he engages in blame-shifting. He blames the officers for the violence that occurred on January 6, 2021. *See e.g.*, *id.* at 8 (explaining that when the police "attack innocent peaceful men, they get angry and start striking back"). He accuses the media of mispresenting the facts and wrongfully demonizing the rioters in the aftermath of the riot. And he

---

[8]   32-Foot Bear Spray (8.1 oz.) with Holster, Counter Assault, available at https://counterassault.com/products/8-1-oz-bear-spray-with-holster.

blames the FBI, the prosecutors, and the January 6th Committee for what he believes was his wrongful arrest and detainment pending trial.

On July 26, 2022, after his letter was published on The Gateway Pundit's website, Taake gave an interview with the outlet.[9] In this interview, Taake proclaimed that he would accept punishment only when "Nancy Pelosi's Storm Troopers," *i.e.*, police officers present on January 6, are also punished. When asked what keeps him going while detained, Taake responded,

> ***Really just knowing this is all a bunch of garbage. That when we get out of this, we'll be fine. Knowing this is not going to take us down. We're not going to be here forever, a couple years if it turns out bad and we have to do some time, a few years, and we'll be better off.*** Hopefully some good comes of this for the country so the people can see what's going on with the ***clearly selective persecution***. Hopefully it'll wake people up to see… but if they don't get their news from certain areas they have no idea what's going on, you know. They only see the one-sided charade of the January 6 committee, and what CNN and MSNBC lie about on the constant.

On March 1, 2023, Taake gave an interview to the Stew Peters Network about the then-planned release of additional footage of January 6 by Tucker Carlson.[10] When asked what on the new footage might exonerate him, Taake said:

> What I really want to see is being attacked by officers the instant that I walked onto the property. We were not told to leave, I did not see any signs that the area was closed, we weren't given any hand signals or signs to turn around, nothing. Just instantly attacked by police . . . I will take consequences for my actions if everyone takes consequences for theirs. If we were set up, if we were baited into it, so that we were attacked and respond in violent ways, that needs to be shown. You do not

---

[9] *January 6th Prisoner Held in "Cage Like a Dog" in Penitentiary Yard by the Biden Regime – Desperately Needs Help! EXCLUSIVE AUDIO INTERVIEW!!!*, The Gateway Pundit (Jul. 26, 2022), available at https://www.thegatewaypundit.com/2022/07/january-6th-prisoner-held-cage-like-dog-penitentiary-yard-biden-regime-desperately-needs-help-exclusive-audio-interview/.

[10] *J6 Political Andrew Taake Joins To Discuss J6 Footage Being Givien To Fox News*, Stew Peters Network (Mar. 1, 2023), available at https://frankspeech.com/video/j6-political-andrew-taake-joins-discuss-j6-footage-being-givien-fox-news.

slap a red-blooded American in the face and expect him to turn and do nothing.

On June 3, 2023, Taake into the Cowboy Logic radio show. While on air, he falsely and strongly insinuated that he was being charged with conduct that he "didn't do."[11]

Lastly, on December 25, 2023—just *five days* after he pleaded guilty in this case—Taake called into the so-called "Freedom Corner," a nightly vigil hosted outside of the D.C. Jail in honor of detained January 6 defendants.[12]  During the call, Taake told listeners that he had to "admit to stuff that didn't happen" in his recent guilty plea:

> I went to go accept a … I'm not gonna call it a deal … but I went to go accept a plea … and to have to bite that bullet and kind of swallow that glass was a really tough thing but … this long into this fight I didn't think I'd still be here at this point. I thought I'd be moved along back in Texas or back home with family at this point. ***Back in 2021 I did not think that I was ever gonna admit to stuff that didn't happen. Like I had to the other day.***

### III.   THE CHARGES AND PLEA AGREEMENT

On October 29, 2021, a federal grand jury returned a superseding indictment charging Taake with eleven counts, including, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Three). On December 20, 2023, Taake was convicted of Count Three based on a guilty plea entered pursuant to a plea agreement.

---

[11] Cowboy Logic - 06/03/23: Andrew Taake (J6er), Cowboy Logic (June 3, 2023), available at https://rumble.com/v2r9yic-cowboy-logic-060323-andrew-taake-j6er.html.

[12] 1791 Storm Trooper Live, YouTube (Dec. 25, 2023), available at 1791 storm trooper #PMHQ #J6 #FREEDOMCORNER THE GREATEST SHOW ON EARTH DECEMBER 25 - YouTube ( 1:10:57–1:11:45).

## IV.    STATUTORY PENALTIES

Taake now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, under 18 U.S.C. § 111(a)(1) and (b). He faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  Offense Level Computation

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the revised PSR's Guidelines analysis:

**Count Three: 18 U.S.C. § 111(a)(1) and (b)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level (Aggravated Assault) | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b) | Official victim | +6 |

**Adjusted Offense Level**                                                               **26**

PSR ¶¶ 31–38.

### B.  The Acceptance of Responsibility Reduction is not Warranted

The Probation Office determined that the adjustment for acceptance of responsibility is not warranted due to Taake's post-plea statements. The government agrees.

U.S.S.G. § 3E1.1(a) provides that if a defendant "clearly" demonstrates acceptance of responsibility for his offense, the offense level can be decreased by two levels. If a defendant

qualifies under § 3E1.1(a), for offense levels of 16 or more, an additional 1 level decrease is available upon the government's motion. *See* U.S.S.G. § 3E1.1(b).

While the entry of a guilty plea and admitting the conduct comprising the offense of conviction and all relevant conduct is "significant" evidence of acceptance of responsibility, such evidence can be outweighed by "conduct of the defendant that is inconsistent with such acceptance of responsibility." *See* U.S.S.G. § 3E1.1, cmt. 3. For that reason, the Sentencing Guidelines specifically state that "[a] defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right." *Id.*

For the same reason, Taake's plea agreement requires that he demonstrate acceptance of responsibility not just at the time of his plea, but also during the period between his plea and his sentencing. The agreement specifically states that the government would only agree to the 2-level reduction of § 3E1.1 if Taake "clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through [his] allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence." *See* Plea Agreement, ECF No. 66 at 3.

While denial of acceptance of responsibility is a serious request, it is not without precedent in cases with similarly situated defendants. For example, in *United States v. Palmer*, 21-cr-328 (TSC), the defendant made post-plea statements about his January 6 conduct on his fundraising website that were demonstrably false and exhibited a lack of remorse. Given those statements, the government and Probation Office determined that the acceptance of responsibility adjustment was no longer warranted. And the court agreed. *See id.*, Sent. Hrg. Tr. at 17.

Taake's post-plea statements, detailed above, demonstrate that Taake does not accept responsibility for his actions, and in fact, denied that he committed the offense to which he pleaded guilty. Specifically, Taake, in his December 25, 2023 call to the Freedom Corner, said that he never thought he "was ever gonna admit to stuff that didn't happen. Like [he] had to" at his change-of-plea hearing.[13] Given that Taake's claim that the "stuff" he admitted to at the time of his guilty plea "didn't happen"—in other words, that he lied during his plea allocution—Taake has not accepted responsibility for his conduct on January 6, 2021. Thus, he should not receive the benefit of a reduced total offense level.

## C. Criminal History and Guidelines Range

The U.S. Probation Office calculated Taake's criminal history as category I, which is not disputed. PSR ¶ 47. Accordingly, the government agrees with the Probation Office's calculation that Taake's total offense level is 26, and his corresponding Guidelines imprisonment range is 63 to 78 months. PSR ¶ 91.[14]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[13] 1791 Storm Trooper Live, YouTube (Dec. 25, 2023), available at 1791 storm trooper #PMHQ #J6 #FREEDOMCORNER THE GREATEST SHOW ON EARTH DECEMBER 25 - YouTube (1:10:57–1:11:45).

[14] Paragraph 91 contains what the government believes is a typographical error: it states the range as "63 months to 77 months." The correct range, as reflected in the Probation Office's recommendation, is 63 months to 78 months.

## A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Taake's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Taake came to the Capitol on January 6, 2021 armed with a whip designed to inflict maximal damage and a chemical irritant designed to stop a charging grizzly bear in its tracks. In other words: Taake came prepared for violence. His weapons of choice—and the use he put them to—set him apart both from rioters who shoved or pushed officers without using a dangerous weapon, and also from those who assaulted officers with less inherently dangerous weapons. Moreover, Taake's repeated spraying of officers caused many of them to retreat from a police line desperately trying to hold back a violent mob, and made those officers even more vulnerable to violence from other rioters. Officer N.T., for example, was immediately blinded by the spray. Luckily, he was able to retreat behind the safety of the police line, but he could have easily been overtaken and beaten (or worse) by other rioters. He rightfully feared that fate in the moment.

Taake intended to injure and incapacitate officers on the line, if not cause them severe injury. That is the only credible explanation for his repeated and targeted assaults. And though there is no evidence that his attacks led to serious bodily harm for the officers, they very well could have. Thus, the nature and circumstances of Taake's offense were of the utmost seriousness, and fully support the government's recommended sentence of 78 months of incarceration and 36 months of supervised release.

### B.  The History and Characteristics of the Defendant

As Taake said in his letter to The Gateway Pundit, he does not "have any excruciatingly tough stories or major hardships from [his] childhood" like other defendants this Court may have seen. *See* Exhibit 12 at 4. Though he allegedly experienced violence at the hands of his brother while growing up, by Taake's own admission, when he turned to violence as a coping mechanism, he "created more of [his] own problems than those [he] was running from." *Id.* at 5. That pattern led him to the Capitol on January 6, and as evidenced by infraction reports from the Bureau of Prisons and the D.C. Jail, the pattern continues.

Though Taake scored a criminal category of I, his adult criminal history and violent conduct while incarcerated pending resolution of this case is nevertheless significant:

- In May 2007, at age 18, Taake was arrested for possession of cocaine, a felony. While the case was pending, Taake was arrested for giving a false name to police due to outstanding warrants for his arrest. In September 2007, Taake pleaded guilty to the possession charge and was given the chance to complete a diversion program over a three-year probationary period. As part of his guilty plea, the false identification charge was dismissed. PSR ¶ 50. A year later in October 2008, likely due to the assault conviction described *infra*, Taake's conviction was entered, and he was sentenced to six years' probation. In 2014, Taake's probation was extended. His probationary term expired in October 2015. PSR ¶ 45.

- In April 2008, at age 19 and while on probation for possessing cocaine, Taake was convicted of intoxicated assault (a felony) after driving while intoxicated and crashing into another vehicle, causing serious bodily injury to its occupant. He was sentenced to a six-year suspended sentence, which ran concurrently with his probationary term from his felony possession conviction. His probation conditions included 10 days in jail, community service, and inpatient treatment. PSR ¶ 46.

- In March 2015, while on probation, Taake was convicted of speeding, driving without insurance, and driving without a valid license. PSR ¶ 48.

- In May 2016, Taake was arrested for soliciting a minor online, a felony. According to the PSR, Taake initiated a conversation on a social media application with an undercover officer ("UC") posing as a 15-year-old girl. After sending multiple explicit messages to

34

the UC, Taake proposed an in-person meeting. The UC agreed and sent Taake an address. Before the meeting, Taake sent additional messages to the UC, including telling her that he "could go to jail" for what he was doing. Taake then went to the address the UC provided and was arrested. He was released on a $20,000 bond. His bond was revoked after his arrest and detainment in this case. The case remains pending. PSR ¶51.

- While detained at USP – Lewisburg during the pendency and detention in this very case, Taake was found guilty of fighting with another inmate in March 2022 and August 2022[15] and of giving/accepting money without authorization in December 2022. PSR ¶ 14.

- While detained at the D.C. Jail, Taake was written up for fighting with another inmate on December 14, 2023, less than two weeks before his change-of-plea hearing. Though he claimed self-defense, jail officials reviewed the CCTV footage and issued him a disciplinary report. *See* Gov. Exhibit 13.

These prior charges, convictions, and infractions—the latest occurring just before his guilty plea in this case—demonstrate Taake's propensity for violence and contempt for the law both before and after the events of January 6. The fact that Taake was on pretrial release for a serious felony—the solicitation of a minor—when he came to the Capitol is particularly concerning and telling. As is the fact that three loaded weapons, none of which were registered to Taake, were found in Taake's home upon his arrest.

Taake's history and characteristics also include a complete lack of remorse and failure to genuinely and unreservedly accept responsibility for his actions. Not only did Taake refuse to accept that what he did on January 6 was wrong and wholly unjustified, but as detailed *supra*, days

---

[15] Taake reported to the PSR writer that "he was attacked by another inmate" in August 2022, leading to a significant loss of use of his dominant hand. PSR ¶ 66. It is unclear to the government whether Taake is referring to the same August 2022 incident for which he was found guilty of fighting with another inmate and punished accordingly. *See* PSR ¶ 14. Moreover, neither the PSR writer nor the government has seen any evidence in support of Taake's claims that he has lost function of his dominant hand or that the alleged injury "was not properly handled by the jail." *See id.*

after the riot, Taake expressed a willingness to go back to Washington, D.C. to do it all again, this time at Inauguration. And in the intervening years since his arrest, nothing seems to have changed. Thus, Taake's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Taake's assaults of numerous law enforcement officers and entry into the Capitol building—crimes committed while on pretrial release for a child solicitation charge—was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[16] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. More specifically, when a defendant like Taake—who for years has been spreading disinformation and lies about January 6 and his own conduct—takes a plea and then, less than a week later, publicly disavows his admission of guilt, the sentence he receives will

---

[16] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

be more closely watched than that of others who have truly taken responsibility and disavowed their illegal conduct.

The Court should also impose a significant sentence to deter the use of bear spray and other OC sprays against law enforcement. Such sprays were deployed hundreds of times on January 6 against law enforcement, and they incapacitated dozens of officers up and down the line. Firing chemical irritants is the easy and cowardly move—one need only press a button and then retreat, as Taake did at least four times. The Court's sentence should deter the use of this widely available, easily used, dangerous weapon against law enforcement and, equally importantly, counter the narrative that its use is less serious than other dangerous weapons given its commercial availability.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, as discussed above, despite Taake's criminal history category of I, his pending child solicitation case, the fact that he had three loaded firearms in his home upon his arrest, his recent history of infractions while being detained, and his statements before and after his arrest, collectively show a clear pattern of disrespect for the law and the criminal justice system.

Second, to date, Taake has not expressed *any* remorse or regret for his conduct on January 6. To the contrary, both before and after his arrest, he has taken every opportunity to justify his violent behavior, spread disinformation, and promote wild, unsupported conspiracy theories about January 6. His story has been consistent, fantastical, and self-serving: he and the other rioters were both the victims and heroes of the day. Not one thought has been spared for the hundreds of injured

police officers and the people inside the Capitol that day. And that is because, in his view, any riotous conduct that occurred was either intentionally provoked by the police, committed by agitators in the crowd, or otherwise planned by those in power. Taake's public statement following his guilty plea—that he had admitted to things that "didn't happen"—only further underscores the absence of remorse and regret and Taake's general aversion to the truth.

Lastly, as discussed, Taake has repeatedly made statements from which one can infer a predisposition to committing the same—if not worse—offense again. A few days after January 6, after he had time to absorb the news and the impact of the day's events, Taake told a stranger that there were "many many Patriots ready to head back" to Washington, D.C. for the Inauguration. Given the underlying offense, it is reasonable to assume that Taake considered himself to be one such patriot and that the return to Washington, D.C. he was discussing would not have been to support the peaceful transfer of power. That statement, combined with his lack of remorse and an upcoming presidential rematch election, make the threat of recidivism for this defendant all too real.

Thus, only a severe punishment has a chance of deterring Taake from using and threatening violence in pursuit of his political goals and from continuing to actively disrespect the rule of law.

E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr.

39

at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[17]

---

[17] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[18]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Caldwell*, 21-cr-0181-CKK is one such useful comparator. Like Taake, Caldwell pleaded guilty to violating 18 U.S.C. § 111(a)(1) and (b) for his use of bear spray against police officers on the Lower West Terrace on January 6. The cases share other similarities—both carried radios and glasses, entered the Capitol through the Senate Wing Door, and bragged about their conduct in the aftermath. While Caldwell received a three-level enhancement for bodily injury to an officer that Taake did not, Caldwell also received a three-level reduction for acceptance of responsibility that Taake has not earned. So, each faced the same guidelines range. Judge Kollar-Kotelly sentenced Caldwell to 68 months' incarceration, but a few key differences between the two cases weigh in favor of a harsher sentence for Taake. First, unlike Caldwell, Taake physically

---

[18] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

attacked an officer with a second weapon: the metal whip. Second, Caldwell was inside the building for two minutes, compared to Taake's twenty, during which time he brandished the metal whip. Third, Caldwell expressed genuine remorse and never attempted to justify or rationalize his actions, as Taake has done at every turn. And fourth, while both men were determined to have a criminal history of I, Taake's history of violence and pending child solicitation case nevertheless distinguish his criminal history from Caldwell's.

Another comparator for the court's consideration is *United States v. McHugh*, 21-cr-0453-JDB. There, Judge Bates found McHugh guilty after a stipulated trial of violations of 18 U.S.C. §§ 111(a)(1) and (b) and 1512(c)(2). Though Taake resolved his case via plea agreement and avoided an obstruction of an official proceeding conviction, the underlying conduct is similar. Both men were part of the first wave of rioters to breach the restricted perimeter at Peace Circle and enter the West Plaza. Both sprayed police officers with bear spray, causing the officers pain and disrupting their ability to protect the Capitol building and its occupants. Both also confronted officers at other times—McHugh fought with police over control of a barricade and joined in the pushing of a large metal sign at the police line; Taake fought an officer with a metal whip and helped to trap and prevent a group of reinforcement officers from reaching their fellow officers on the West Plaza. McHugh used a megaphone to spew vitriol towards officers and encourage other rioters to act against the officers, while Taake encouraged other rioters to breach the Capitol, and, unlike McHugh, entered the Capitol himself. Lastly, both men failed to exhibit remorse or otherwise accept responsibility. Judge Bates sentenced McHugh to 78 months of incarceration.

One final comparator is *United States v. Kenyon*, 21-cr-00726-CJN. In that case, Kenyon pleaded guilty to one count of 18 U.S.C. § 111(a)(1) and (b). Though Kenyon did not deploy bear spray on January 6, he did participate in multiple violent assaults of officers in the Lower West Terrace tunnel, inflicting bodily injury on at least one officer, and he damaged an exterior window of the Capitol. Both Kenyon and Taake have concerning criminal histories but landed in criminal history category I. And both had firearms in their possession upon their arrest despite being felons. Both men stayed inside the Capitol for the same amount of time. And both served significant amounts of pretrial detention during some of the worst points of the pandemic. But unlike Taake, Kenyon did not disavow or downplay his conduct or spread disinformation following the riot, and he expressed genuine remorse both before and at sentencing. This Court sentenced Kenyon to 72 months of incarceration. Given the additional aggravating factors present here, Taake is deserving of a harsher sentence.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[19] Generally, restitution under the VWPA must "be tied to the loss

---

[19] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer N.T., did not suffer bodily injury because of Taake's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Taake must pay $2,000 in restitution, which reflects in part the role Taake played in the riot on January 6.[20] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Taake's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VIII. FINE

Taake's convictions under Section 111 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing

---

[20] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. Despite receiving court-appointed counsel, Taake (through his mother) has raised $66,339 in two GiveSendGo campaigns. In the first, titled "Political Prisoner of Capitol Protest Andrew Taake," Taake raised $64,313 and had a fundraising goal of $100,000. Taake promoted that campaign aggressively in his many interviews. The website page for this first campaign was taken down after May 2023. PSR ¶ 85. The second campaign, which is still currently active, is titled "freeandrewtaake."[21] It has raised $2,026 of its $100,000 goal. A review of the website pages for both campaigns, including the pictures of Taake and the fundraising messages to benefit him, reveals that they are largely the same. Both campaigns were created by Taake's mother, but both campaigns pledge that the funds "will be received by Andrew Taake." According to the fundraising pages, the funds are intended to be used "to continue this fight against the setup of events that occurred on January 6th" and "assist in the payment of debt, and allow for quality of life" for Taake.

Throughout the pendency of this case, Taake has had court-appointed counsel—he has no legal fees. He should not be able to profit from his participation in the Capitol breach in this way,

---

[21] Freeandrewtaake, GiveSendGo, available at https://www.givesendgo.com/G9WA9 (last visited March 20, 2024).

and the Court should impose a fine equivalent to the amount raised through the online campaign on the back of his alleged patriotism on January 6 and persecution since: $66,339. Once the Court conducts "an 'appropriate inquiry' as to the availability of the funds for payment," *United States v. Homrighausen*, 366 F. App'x 76, 77 (11th Cir. 2010), any money collected via the fine from Taake's GiveSendGo account can be used to reimburse the cost of providing Taake with court-appointed counsel, *see* 18 U.S.C. § 3006A(f).[22]

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' incarceration, 36 months' supervised release, $2,000 of restitution, a $66,339 fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Madison H. Mumma*
MADISON H. MUMMA
Trial Attorney
N.C. Bar No. 56546
1301 New York Ave. NW

---

[22] The Criminal Justice Act ("CJA") requires district courts to provide legal counsel for criminal defendants charged with a felony when they are unable to pay for an attorney. 18 U.S.C. § 3006A(a)(1)(A). By that same token, the plain language of the CJA authorizes the Court to order repayment of court-appointed attorney fees and expenses if it finds that funds are available to the defendant to pay such fees.

Specifically, if—at any time after counsel is appointed—the court "finds that the person is financially able to obtain counsel or make partial payment for the representation, it may . . . authorize payment as provided in subsection (f), as the interests of justice may dictate." *Id.* § 3006A(c); *see United States v. Wilson*, 597 F.3d 353, 357 (6th Cir. 2010) ("What the [CJA] gives with one hand to a criminal defendant 'financially unable' to pay for legal services it takes away with the other if the defendant turns out to be 'financially able' to obtain counsel").

Washington, D.C. 20530
madison.mumma@usdoj.gov
(202) 913-4794